1, 6, 2, 3, 5, 6, United States v. Frank Peake 1, 6, 2, 3, 5, 6, 2, 3, The prosecution and the conviction in this case suffer from dual infirmities. The due process violation relating to Brady v. Maryland and the fundamental defects in the indictment that... In which the government essentially proceeded on the theory that Puerto Rico was a state. A theory that it is, in other pleadings, contradicted, and which the Supreme Court recently pronounced again on, just last year and... Is that issue properly before us? Your Honor, I think in the usual posture of this case it is. The issue... It's certainly not properly before us under Rule 33. It does not involve any newly discovered evidence. It does not involve any newly discovered facts. The newly discovered evidence test for a constitutional issue such as a Brady violation, though, implicates a number of constitutional factors, as well as a consideration... But you're talking about the legal issue about the alleged unconstitutionality of the statute of conviction. I have a lot of trouble with that argument. One problem is that you hear an appeal of a Rule 33 denial, and it doesn't seem to me that that issue implicates Rule 33, which only governs denials based on newly discovered... On the presence or absence of newly discovered evidence. You have a second problem, which is that that issue was not raised in the District Court, even in the Rule 33 hearing. And we have pretty firm rules about not hearing issues for the first time on appeal. And you have a third problem, that even if your argument was potentially correct, your client's conviction rests on alternative holdings, one of which was that his antitrust conspiracy affected Congress along the several states. So I don't know why we're wasting time on that issue in view of those three facts. Well, if the court, if the panel in general feels that way, I want to move on to the other issue. However, just to briefly respond, I think that it is unusual because the issue was pending at the time the motion for new trial was filed. It was pending in this Court. And the issue does, in my view, technically, and it may just be a technical argument, but those can be important. It is technically relevant because it deals with, as the Court indicated, what the prior panel referred to as a sufficiency question of there being sufficient evidence of a statehood effect. So that as a technical matter... But we've held that sufficiency type arguments can be waived if they're not asserted in the trial court, and this one wasn't. I understand that. We're not raising it as a sufficiency argument. I'm just saying that as a technical matter, I believe it is, it remains part of the case because when you look at the due process violation, the Brady violation, the entirety of the proceedings becomes relevant. And this aspect of the proceeding, that there is no jurisdictional basis for the conviction, as the Court indicated in the other case, presents sort of a supervening factor that should be overlaid into this analysis, as well as the fact that we are dealing with an issue of government, a due process component of the government's actions. And this particular jurisdictional issue relates to the government taking diametrically opposite positions at various times before this Court. Counsel, do you disagree with Judge Sully's statement that the evidence in this case included evidence relating to the impact of the antitrust violations on commerce among the states? I mean, I share the view that that evidence is very much present in this case. So on that basis alone, the status issue that you raise simply doesn't matter. Yes, Your Honor, I don't question the fact that there was discussion of land transport, land transport that affected interstate commerce. But this indictment was charged as a sea transport case that was between states and Puerto Rico. And our focus really, in this case, more so than in the prior case, in the peak period. Even the language of the indictment seems to cover the kind of evidence presented that goes to commerce among the states. And you're suggesting that some evidence going to such commerce was beyond the charging document? Yes, we are, as well as the fact that no one at trial had any idea that that issue was going on. So it would not have been something that was defended, not something that was tried at all. It was an argument that the government made. The government construed the initial Peak 1 argument by the defendant to be essentially a jury instruction argument that should be analyzed on a harmless error type of basis underneath it, which is that you can still look beyond the error if you can find evidence in the record. And so what was an alternative holding by this court is really, in effect, in relation to this case, in relation to this issue of the jurisdictional component of the indictment, doesn't really relate. We don't ordinarily speak of an indictment's sufficiency by reference to whether the evidence was sufficient or not. So we don't think an alternate holder really addresses the issue. The more important question for us is the supervening authority. I see it really more as a law of the case issue, as this has been one continuous process with this motion filed while that issue was pending before this court, and given the supervening authority of Sanchez-Vani, and given the government's own concessions thereafter, that the indicted theory, as everyone understood it going to trial, and as the affirmative allegations of it were that Puerto Rico was a state, since it had that, essentially, since it treated Puerto Rico as a state for purposes of the indictment, that it was affirmatively outside the scope of the statute. You have less than five minutes to deal with the Brady issue, if you want to. Thank you, Your Honor. But you're welcome to continue along this vein, if you'd like. Thank you, Your Honor. The, what we asked for, our most recent pleadings was to remand. During the course of this appeal, new developments occurred. And it is clear, again, in the context of this case, that the record needs to be more fully developed in the district court. The government made numerous representations in response to the motion for new trial, that they had no knowledge whatsoever that there was a quitam action. It only came up maybe six months before sentencing, and that they weren't obligated to tell us in the six months before sentencing. In any event, they were not obligated to tell us until well into the appeal. We now know that that just doesn't make sense. That e-mails, of course, want to show that not only is there knowledge that it's going on, but there's actual control or direction given by the prosecutor in the case to the key undercover witness, the only undercover informant, to manage this quitam action. And he's, and this ongoing discussion, so we know that there's a lot of money. We know that if we are willing to look at documents which aren't properly part of the record. Isn't that correct? Well, the government submitted some of them as well, Your Honor. Yeah, but I don't care who submitted them. The fact of the matter is, we have a record in this case. That record is compiled, in this case and every case, in the district court. Yes, Your Honor. We have got case after case, which says that we can't base our decision on documents, or parties can't ask us to base our decision on documents that were not part of the record compiled in the district court. And the only thing we have in the district court record is a bare allegation by you that the fact that Stallings filed a quitam action on the third day of trial should have been disclosed because it was somehow materially favorable to your client and exculpatory. Your Honor, the facts that we had of record at the time we filed the appeal are different than the facts that are on record now. I believe there is an exception when we are dealing with issues of forthrightness to the court and representations that the district court relied on. And I think that when the other party concedes these facts, I think that they can ordinarily be considered going to the integrity of the judicial process. With regard to the materiality question, again, now that we know that there is more to it, that there is more than just a filing of a complaint, that there is a coordination, it simply gives all the more reason to satisfy at least for the appearance of justice that a remand for the proceedings by the district court occur. The materiality evidence is frequently looked at as well in new trial cases. We think this contradicts the testimony that was given. But sometimes the materiality, the importance of the materiality is its effect on the defense. And that's a very different type of analysis because you're not looking at how many blows the prosecutor will not be able to throw, but how many blows the defense will be able to throw and how effective those punches will be in a criminal case. The government was very concerned about it. They knew from the beginning of this trial that our defense was you can have all these people coming years later and saying that Mr. Peek knew about this. But when the government actually flipped the lights on in this conspiracy, and for a two-month period had its own informant who they're closely working with, managing everything, tape recording everything, they saw no involvement by Peek. But that's simply not true. That's simply not true. The complaint in the Key Tom action contains at least two references to Peek, both of which are highly incriminating. Those references are hearsay. In other words, he's not talking about what he knows. And again, our point there is, and that's fundamental to us as well, is at that point the coordinating branches of the prosecutor are actually working with him to craft that information. So he's putting in things that he doesn't know about. He doesn't claim to have knowledge about the two things that he says, that there was a meeting in Orlando where there's a conclusory reference to things happening. Again, the very fact that that's in there is exculpatory to the sense that the government is not. In the rest of these meetings in Orlando, I mean, Jerry Dominguez, in a carefully reasoned, very detailed opinion, I mean, he talks about testimony provided at trial that places your client at those very Orlando meetings. Isn't that correct? Yes, he talks about the existence of testimony. The detail, again, is found neither in the opinions or the government's brief nor in the transcripts. The detailed reference, the actual trying to pin Mr. Peek down to somebody who was in on this part of the meeting, was not in on this part of the meeting, who actually participated, and came down to these ambiguous, four or five ambiguous e-mails, which are quoted in the initial opinion, Peek 1 in this case. And again, when you're talking about ambiguous e-mails, in the context of the statute that is the most ambiguous of all criminal statutes, really, the concept of whether business collusion or business discussions amounted to anti-competitive or not anti-competitive, that does not amount to the type of evidence that you'd want to prevent the defense from coming forward and saying, look, we have, we now can present somebody who is live on the ground, who was an essential part of it, who was in on it from the beginning, who knows exactly everything, who was tape recording, who was not relying on memory from four or five or seven years ago, but from live action. And look what he said in his complaint. And if he doesn't, if he varies at that point, we now have him locked in. So the question is, is there a reasonable possibility, is there a reasonable probability? And the government's answer to that is that the defense had no weapons at all. But if you look at what the jury did, the jury's response was saying, there's individual jurors who have reached their final decision of not guilty. This is a case where there was an impact, a sufficient impact on the defense, and an intentional one that the court should at least remand for further proceedings, particularly given the new evidence. Thank you. Good morning, Your Honors. May I please support? Sean Stankowski on behalf of the United States. I want to begin by addressing counsel's accusations that the prosecutors lied to the district court and the court of appeals in this case. Those accusations are baseless. The prosecutors didn't know that Mr. Stallings was going to be filed in the Ketam suit, and they certainly did not coordinate with Mr. Stallings or the civil division on the filing of that Ketam suit. That's what we said below, that's what we said to this court, and it is true. I now want to turn to why the district court was correct that the Ketam complaint wouldn't have made any difference at trial. As the district court found, and as I believe the panel has alluded to, the thought Mr. Stallings' Ketam suit would have been favorable to Mr. Peek is no more than wishful thinking. First, the Ketam suit is not exculpatory. It's inculpatory. The Ketam complaint specifically identifies Mr. Peek as a member of the conspiracy. It places him at the Orlando conspiracy meeting, at which there was a great deal of testimony, as well as corroborating documents introduced at trial, and it describes his role overseeing the conspiracy, which is the exact same role that the government's evidence proved he played. Everything else that Mr. Peek claims he would have used the Ketam suit for was already in evidence at trial and therefore would have been cumulative. This includes that Peek wasn't employed at CSTAR at the start of the conspiracy, and it includes that his subordinate, Peter Bacis, was responsible for the day-to-day operation of the conspiracy. What about just the general fact that Stallings may have stood to profit from his version of the facts? Your Honor, that would be relevant perhaps if Mr. Stallings had testified at trial. Was he on the government's witness list? No, Your Honor. In fact, after the FBI raid occurred of CSTAR's headquarters in April 2008, we hadn't been in touch with Mr. Stallings until these October 2012 emails. And the reason is we already had three precipitate witnesses who were members of the conspiracy with Mr. Peek and dealt with Mr. Peek in conspiracy matters on a day-to-day basis. These witnesses had also pled guilty and served jail time, and we think that makes them fairly effective witnesses. Mr. Stallings, on the other hand, hadn't been in touch with us and was sort of on the outside looking into the conspiracy. Now, we have a tendency to not try to overtry our cases, and frankly, our sense from Judge Dominguez was that three precipitate witnesses were too many. So adding a fourth would have been an additional one that was too many. Well, you didn't have that discussion with Judge Dominguez, though. You just said that he wasn't on the witness list anyway. That was just the sense that the prosecutors received from Judge Dominguez in the run-up to trial. But you're correct, Your Honor, he wasn't on the witness list. Because he wasn't on the witness list and there was no indication that we were going to call him, it couldn't have been impeachment evidence as to him. Mr. Peek also argues that this would be impeachment evidence as to Ron Reynolds, who was a Department of Agriculture employee who testified at trial. It is difficult to see how a key tamsuit filed under seal three days before Mr. Reynolds was set to testify would have been impeaching with regards to Mr. Reynolds. And in any event, Mr. Peek acknowledged at both the district court and in his brief in this court that Mr. Reynolds' testimony itself was uncontested. He was only testifying to establish the conspiracy's effect on interstate commerce. Counselor, Mr. Stalding, he didn't benefit handsomely from this key tam action, is that correct? Yes, Your Honor, he ended up receiving approximately a half million dollars from this key tam action. It was, I mean, even though he was not called by either party, it was clear that he was critical to the government's investigation of this conspiracy. Isn't that so? Your Honor, I would agree that he was critical. In fact, wasn't he wired? And didn't he, having been wired, wasn't he able to produce a lot of incriminatory evidence against Mr. Peek? Your Honor, he was critical at the start of the investigation, and he did wear a wire and collected tapes that then allowed, then gave us probable cause to get evident, or probable cause to search CSTAR's headquarters, where we got a lot of documents and, you know, e-mails, memos, tying Mr. Peek directly to the conspiracy. Was Mr. Peek, was he heard on any of these tapes? Mr. Peek was not heard on any of these tapes, but that's not necessarily surprising. The way Mr. Peek ran the conspiracy, for lack of a better term, was he would interact with Mr. Bacci, who was his subordinate who testified at trial on the conspiracy. He wouldn't necessarily be interacting with Mr. Stallings, who was a relatively high-level sales employee, but didn't have any pricing authority as part of the conspiracy. And in any event, all of that evidence was put before the jury. In fact, Mr. Peek's entire opening statement had to do with Mr. Stallings and his lack of, and rather Mr. Peek's, lack of presence on those tapes. So anything that he would have used the Keaton complaint for to try to impeach Mr. Stallings if Mr. Stallings had been testified would have been cumulative. But setting aside the fact that he wasn't on those tapes, three co-conspirators testified against him, and we provided what this court referred to as an overwhelming amount of corroborating documentary evidence tying Mr. Peek to the conspiracy. So the fact that he wasn't on those tapes is either, is both wouldn't have been a surprise to the jury, and also is really of no consequence. You're making, just correct me if I'm wrong, you're making a prejudice, lack of prejudice argument. That's correct. This has nothing to do with the materiality argument? But the two sort of fall in on each other. I mean, it's not material because we don't believe that the Keaton complaint could be used to impeach Mr. Stallings, and because it contains two inculpatory, Mr. Peek, no, no, Mr. Stallings, and because it contains two inculpatory references, it couldn't be impeachment, or it couldn't be exculpatory evidence, rather. What I'm trying to get at, though, is a lot of times when it comes to a potential Brady issue, you know, we rely on the government, the system has to, I think, rely on the government lawyers to, when they come across this kind of information, to make an assessment about whether it is material. Prejudice, I suppose, is more of a backward-looking factor, but materiality is typically looked at up front, so, you know, but your argument is looking at it post-hoc, I think. Is that simply because you didn't know about the evidence at the time, so you couldn't have made that initial judgment that it wasn't material? And when I say you, I just mean the government. Yes, Your Honor, that's correct. With not having the QI-TAM complaint prior to trial, we weren't able to balance whether it would be material or not, although it's plain when you are conducting the backwards-looking analysis that it would not have been material. So where two parts, two branches of the Justice Department are involved, what should the obligation be on the part of the prosecutors if they have a hint that somebody is perhaps going to pursue a QI-TAM action? Actually, there was some facilitation, I think, by the prosecutor. Your Honor, there was some facilitation inasmuch as the prosecutor told Mr. Peek, I'm unable to help you both because I know nothing of this area of the law and because I'm effectively prohibited by department guidelines. You may want to ask the Civil Division, and then the Civil Division told him the exact same thing. We're not able to help you with this. As for what the proper standard should be, there is a memo which we call the Ogden Memorandum, which says that as a matter of best practices, a prosecutor should review Civil Division files if they think there's a QI-TAM suit. But of course, if we reviewed the Civil Division's files prior to trial, we wouldn't have found a QI-TAM suit because one wasn't found prior to trial. And that's besides the point, really, because the Ogden memo isn't Brady, and Brady is what controls this case. Brady was approaching the First Circuit cases applying it, and so he should not be entitled to a new trial because of that. If there are no further questions on the Brady issue, Your Honor. No, I still have a question. So if the prosecutor knew then what the government knows now, what do you think the analysis would have been in terms of materiality? Not prejudice, but materiality. I'm hearkening back to what you said earlier about where you said it's not exculpatory, but it is impeachment material. Your Honor, at the time the complaint was filed in January 2013, and indeed at the time we received emails from Mr. Stallings in October 2012, we already knew that we wouldn't be calling Mr. Stallings at trial. So the analysis would have been the exact same, and indeed was the exact same. The prosecutor went through the analysis and determined, because Mr. Stallings wasn't being called at trial, that it wouldn't be impeachment evidence and it wasn't necessary. Now, of course, had he been called at trial, we of course would have turned this over, not necessarily because Brady requires this, but because it may have been jinx act material, it's possible it could have been giglio material, but because we knew we weren't calling Mr. Stallings at trial and we're not required to turn over, as I believe the Supreme Court said in Bagley, every piece of evidence in our case file and every communication. What would you have turned over if you were to call Mr. Stallings? What would you have turned over? We would have turned over his email reaching out to us, asking whether there was any way he could get some sort of compensation. We would have turned that over, Your Honor. We obviously couldn't have turned over the key to him. Why do you say that's jinx act material? Because it's correspondence between the government and a witness that it would then be calling. But again, because we didn't call them and we had no intention to call him, we didn't turn anything over. And also, I think we would have erred on the side of caution because we take these responsibilities very seriously. Everyone knew that it wasn't secret that Stallings was very important to this investigation, right? You're correct, Your Honor. But also, the information that you're describing, if it had been in the possession of the defense, might have influenced their decision whether he should now be included on their witness list. It certainly would suggest in a way that the absence of those communications does not, that he might actually have been a useful witness to the defense. Isn't that so? I mean, we never thought. I disagree with you, Your Honor, because Mr. Peek had Mr. Stallings' FBI 302s, which implicate Mr. Peek in the conspiracy. So looking at it post hoc, it's easy for him to say now in a brief, well, yes, maybe I would have called him and it would have changed the calculus. But looking at it at the time of trial, it would have been, I wouldn't go so far as to say malpractice, but it would have been a very curious decision to call someone you knew possessed in culpatory evidence in the hope that you could then try to impeach them. It just doesn't make much sense as a matter of trial strategy. And had he gone up there and somehow exculpated Mr. Peek, well, then we would have impeached him with the FBI 302s that we had. And his evidence would have paled in comparison to the evidence that Mr. Peek's three co-conspirators provided. And so it's, had he called Mr. Stallings, perhaps the calculus would have been different. But he didn't call Mr. Stallings, and so it just can't be impeachment evidence as a matter of law. Turning to the Puerto Rico issue very quickly, that issue was not before this panel for two reasons. I believe the panel touched on it during opposing counsel's argument. First of all, for at least two reasons, I should say. First of all, it was not part of Mr. Peek's Rule 33 motion, the denial of which is all that is on appeal to this court. It couldn't be, it's not new evidence. And the second reason is this court's alternative holding that the government established a section 119 violation because of the interstate elements of the conspiracy, regardless of whether Puerto Rico is treated as a state or a territory. And so once there are no questions on that, we ask this court to affirm. Thank you. In some review of the government's answers to the court's questions, they may all be absolutely true. Much of them relate to additional facts regarding what the government had, other things the government had in its files, additional facts with regard to what the government's relationship with Stallings was in this period. These are the types of things that should, again, be addressed in a trial court form. And in this particular context of this case, the unusual context of this case, where the trial court decides a case on the basis that we really now know is not accurate, this is a perfectly appropriate result would be to remand for further proceedings. And the trial court can then determine exactly how extensive those proceedings have to be. The point of there being not a full record on the case for us to proceed on in some of our arguments really is our argument. Our argument even originally was that when you have a situation like this, where you have two branches of the same antitrust division in Washington engaging with the individual, that it really is something that you would want at least some discovery on, and then this report can determine whether it needs a full-fledged hearing or not. May I ask you a question? Even if we were to consider the extra record evidence, which it seems to me we never do, but I could be wrong, maybe we only rarely do, and even if we could conclude that it was exculpatory, I don't see how you're going to be able to show a likelihood that it would have changed the result. So how do you get past that? The Brady standard on a new trial, again, because it's a constitutional standard rather than a pure... Reasonable probability, right? That's the standard? And it's alternatively defined as undermining confidence. And again, to some extent it depends on how much confidence you have in the ability of the defense to use the evidence to its advantage, and it's a very difficult issue to go forward on. But we have the unique factor in this case that it essentially was the defense. The defense was, look, you've put these four e-mails in front of us. The e-mails are ambiguous. You've put these three witnesses in front of them. Two of them don't even work for his company. You've put one guy from his company on the stand, Bacci, and he is the one who is so completely involved in it, absolutely involved in it, who the comments were made about by the district court in Jacksonville originally, and it's unsurprising that he is going to make, again, conclusory statements about Peek. And the reason why the court doesn't see any quotes that actually you can say, okay, that's testimony that definitely says he knew, is because it's conclusory at best. So you're going to put Stallings on, and then you're going to impeach him. Well, the thing about the federal practice is there's no discovery. The only discovery we get is Brady, basically. We don't get Jinx, even though we think there's Brady in the Jinx. But that's the tactic, right? You're going to put him on, and then you're going to impeach him. Well, we're going to put him on first to establish what we can talk about. We can infer in an opening statement. You can say things, but then you don't have as much evidence to back it up. We can try to draw things out of an agent who was supervising him. It's a borderline call whether to put him on at all. What did you want the QTAM information for? The QTAM locks him in. But the point of putting this man on to say you've investigated this case for two months, you're in the company, you're an insider, you're a high-level official. It's not like, oh, my gosh, he's a button man in a mafia organization. He can't talk to the Don. I mean, this is a high-level official. It didn't make sense, this argument. Oh, my God, he can't talk to this guy in the street. That's not the situation. But when you have him locked into a statement where he has filed a QTAM action and not a single statement in his factual statement in the QTAM relates to any fact that he's accusing Peek of other than what the government has put into the QTAM, that makes it, yes, then you have enough. So the answer to Chief Judge Howard's question is you want to put him on the stand to impeach him. We want to put him on the stand to establish what we talked about in the opening statement, that he flipped the light on and you could see who was scurrying and Peek wasn't scurrying. And that's so powerful when you can actually do it with a live witness. And what we have with the QTAM is we can avoid the bomb that's lying in that path that's lying for us for him to say, but I've got an excuse, but I've got an excuse, I actually know more. Because we have what he says he actually knew and what he talks about what he actually knew in his complaint. He's trying to get his half a million dollars. It's not there either. And it makes a defense. And, excuse me, for that reason, we ask the court to reverse. Thank you. Thank you both.